NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0489n.06

No. 11-5975

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*May 15, 2013*

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| JEFFERY SILER, | ) | THE EASTERN DISTRICT OF |
| | ) | TENNESSEE |
| Defendant-Appellant. | ) | |

Before: BATCHELDER, Chief Judge, KEITH, and MARTIN, Circuit Judges.

BOYCE F. MARTIN, JR., Circuit Judge. Jeffery Siler appeals the district court's denial of his motion to suppress statements that he made during two interviews with Investigator David Ogle of the Knoxville Police Department. Siler argues that the statements should have been suppressed because he was coerced by Ogle. Because we find that Siler's confession was not voluntary, we reverse the district court.

I.

The Knoxville Police Department arrested Siler for a probation violation on February 22, 2010. Upon Siler's arrival at the station, Investigator Ogle asked to speak with Siler about a series of burglaries. At the beginning of the first interview, Ogle read Siler his *Miranda* rights and Siler waived those rights. Ogle then began to question Siler about a burglary on Hillcrest Drive in which two rings, a Kimber handgun, and a watch were stolen.

Throughout the interview, Ogle misrepresented the amount of evidence he had against Siler and told Siler he had a "pretty good case" against him for two burglaries. Ogle said if Siler helped him locate the Kimber handgun from the Hillcrest burglary, he would speak with the District Attorney about Siler and try to get Siler into drug rehabilitation. Ogle told Siler that he had "clout" with the District Attorney and discussed Siler's past convictions and the impact that Siler's criminal history would have on the theft and burglary charges.

Ogle told Siler that he had evidence linking Siler to two burglaries and two felony thefts and that "he could not promise him anything but that he was the one who typed the warrants." When Siler asked Ogle to clarify what he meant, Ogle replied that, "it all has to do with whether you get charged or whether you get sent to rehab . . . . " Siler asked to speak with the District Attorney if Ogle was unable to put an agreement in writing and Ogle replied that, "then we would have to charge you." Ogle repeated that he would be writing the warrants on the two burglaries and thefts and that, with Siler's background, he would face jail time. Ogle then left the room.

A minute later Siler asked to speak with Ogle again. When the investigator re-entered the room Siler asked, "if I put you up on the gun, what are you going to do for me[?]" Ogle said that if he got the gun, he would speak with Siler's probation officer and relay that Siler was working with the police and was a good candidate for probation. During the interrogation, Ogle had placed a stack of papers in the room that allegedly contained around thirty different investigations involving Siler. Siler motioned to the stack of papers and asked what Ogle could do for Siler "right now." Siler asked if the stack of papers would go in the trash if he helped find the gun and Ogle responded, "there you go," and Ogle said he would do his best to get Siler help. When Siler expressed more

worries about the papers Ogle told him that he didn't have to worry about it, that he, Ogle, was the one who typed the warrants, and if he did not type a warrant, Siler would not be charged with a crime.

Siler asked who would be charged with the gun, and Ogle said that "nobody" would be charged. When Siler asked again, Ogle clarified, "nobody's going to get charged with the gun . . . I want the gun because it means a lot to the [victim] . . . it doesn't have anything to do with you . . . nobody is going to get charged with the gun." Siler wanted to know what would happen to a person if the gun was found in his or her house, Ogle responded "I will not charge them." Ogle once again told Siler that if Siler could get the handgun, he would speak with Siler's probation officer.

A second interview took place on March 2, 2010 at Siler's request. In the days prior to the second interview, Siler and his wife had repeatedly tried to contact Ogle to talk about the case. At the beginning of the second interview, Ogle again read Siler his *Miranda* rights. Siler asked if what he said would incriminate him; Ogle said he did not know but that he "could not get [Siler] help unless it [was] court-ordered" and through the District Attorney. Ogle said he could not "make [Siler] any promises," but that he would speak with the District Attorney about getting Siler help. Siler subsequently waived his *Miranda* rights. Siler said he did not want to do or say anything that would incriminate him. Ogle said that he would tell the District Attorney about Siler's help, that the District Attorney "always works with us," and that Ogle believed "they will work with us this time." Siler then proceeded to confess to the Hillcrest burglary and to admit that he sold the handgun to his nephew. After the confession, Ogle told Siler he would let the District Attorney know that Siler had cooperated and told Siler that he was "not going to go across the street," to federal court, and that

Siler would not be "charged federally or anything like that." The police subsequently obtained a search warrant and found the gun in Siler's nephew's home.

On May 18, 2010, federal prosecutors charged Siler with a single count of felony gun possession in violation of 18 U.S.C. §§ 922(g)(1) and 924(e) in the District Court for the Eastern District of Tennessee. Siler filed a motion to suppress the statements that he made during the two interviews with Ogle, as well as the gun, as fruit of the poisonous tree. On November 10, 2010, the magistrate judge issued a Report and Recommendation recommending that the district court deny Siler's motion to suppress. The district court accepted the magistrate's report in its totality and denied Siler's motion to suppress. Siler pleaded guilty under a plea agreement that preserved his right to appeal, and the district court sentenced Siler to sixteen years imprisonment, followed by five years of supervised release.

II.

We review the district court's factual findings on a motion to suppress for clear error and its legal conclusions de novo. *United States v. Miggins*, 302 F.3d 384, 397 (6th Cir. 2002) (citing *United States v. Bradshaw*, 102 F.3d 204, 209 (6th Cir. 1996)).

Siler argues that his confession was involuntary and that the Court should suppress the confession and also the gun as fruit of the poisonous tree. When considering the voluntariness of a confession, we consider the "totality of the circumstances" to determine whether a statement was the "product of an essentially free and unconstrained choice by its maker." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973). "When a defendant claims that a confession was coerced, the government bears the burden of proving by a preponderance of the evidence that the confession

was in fact voluntary." *United States v. Johnson*, 351 F.3d 254, 260 (6th Cir. 2003). In determining whether a confession is involuntary due to police coercion, this Court has three requirements that must be met: "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999) (citation omitted).

We believe the first *Mahan* factor is determinative in this case and that Ogle's statements were objectively coercive and Siler believed them to be true. We have held that "[c]oercive police activity is a necessary predicate to finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *United States v. Rutherford*, 555 F.3d 190, 198 (6th Cir. 2009) (citing *Colorado v. Connelly*, 479 U.S. 157, 166 (1986)). Offers of leniency made during a police interrogation have a coercive effect, *Williams v. Withrow*, 944 F.2d 284, 289 (6th Cir.1991), *rev'd on other grounds*, 113 S. Ct. 1745 (1993), though a promise to speak with the prosecutor about a defendant's cooperation does not automatically render a confession coerced. *United States v. Stokes*, 631 F.3d 802, 809 (6th Cir. 2011). In general, police promises of leniency and threats of prosecution may be coercive if they are "broken or illusory." *Johnson*, 351 F.3d at 262 (finding a promise of leniency was not coercive because the police refrained from prosecuting a third party as promised). An illusory promise is one that "lacks substance . . . [and] does not actually commit the police to undertake or refrain from any particular course of action." *Id.* at 262 n.1. Furthermore, a promise is problematic if a police officer leads a defendant to believe that he "will receive lenient treatment when this is quite unlikely," and makes a promise, without authorization

by the prosecution. *United States v. Little*, 9 F.3d 110 (6th Cir. 1993) (finding a police officer's inducement proper because the police officer consulted the prosecution, who authorized his leniency offer) (citing *United States v. Long*, 852 F.2d 975, 978 (7th Cir. 1988)) (unpublished).

Here, the promises went too far and Ogle's statements to Siler were coercive. During the interviews, when Siler asked Ogle what would happen if he provided information on the gun, Ogle was very clear that no one would be charged and that Siler did not need to "worry about it." Furthermore, Ogle clearly told Siler that he, Ogle, was the one who wrote the warrants, indicating that Ogle influenced which cases the prosecutors would pursue and whom the police would arrest. These explicit statements were legally inaccurate — there is no evidence in the record that would establish Ogle had authorization to bind either the District Attorney or federal prosecutors. Furthermore, Ogle broke his promise when he turned Siler over to federal prosecutors who charged Siler with a weapons violation. The government argues that Siler was not charged in state court and that Ogle claims he did not intend to go to the federal prosecutors when interrogating Siler, but Siler should not have been expected to understand that "no one will be charged" meant only that no one would be charged in state court. Ogle's actions and statements were objectively coercive.

Regarding the second and third *Mahan* factors*,* it is evident that Ogle's coercive statements overbore Siler's will and were the crucial motivating factors in Siler's decision to confess. During the interviews, Siler was very focused on what Ogle was promising him regarding leniency, and Siler exhibited serious concern about making incriminating statements concerning the gun. Furthermore, Siler made a point of calling Ogle back into the interrogation room during the first interview to ask for more details about leniency as it related to the gun charge. In the days between the two

interviews Siler repeatedly tried to get in contact with Ogle, which is evidence of the pressure he felt to take advantage of Ogle's promises. Ogle's repetitive promises that no one would be charged for the gun were sufficient to spur a defendant, even one with experience with the criminal justice system, to make a confession and certainly were not good investigative work.

The government has failed to show by a preponderance of hte evidence that the confession was voluntary. The totality of the circumstances show that the confession was, in fact, coerced. While weapons charges are usually brought in federal court, Siler should not have been charged because this case presents a stark example of police impropriety and deplorable interrogation techniques. Accordingly, we find that the government has not met its burden of proving, by a preponderance of the evidence, that Siler's confession was voluntary.

III.

The motion to suppress is granted.