RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0078p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

                 *Plaintiff-Appellee,*

     *v.*

                            No. 14-1635

LEON TRENTON-GERAD BINFORD,

                 *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:13-cr-2027—Denise Page Hood, Chief District Judge.

Argued: December 9, 2015

Decided and Filed: March 31, 2016

Before: BOGGS and McKEAGUE, Circuit Judges; BERTELSMAN, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Stephanie F. Cagniart, BAKER BOTTS L.L.P., Austin, Texas, for Appellant. Patricia Gaedeke, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Stephanie F. Cagniart, BAKER BOTTS L.L.P., Austin, Texas, for Appellant. Patricia Gaedeke, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

---

[*]The Honorable William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation.

---

**OPINION**

---

**OVERVIEW**

BERTELSMAN, District Judge.    Defendant-Appellant Leon Binford appeals his convictions and enhanced sentence of 180 months' imprisonment after a jury found him guilty of being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1), and possessing with intent to distribute marijuana under 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D).  Binford argues that both convictions should be vacated because they were based on evidence admitted in violation of his Fourth and Fifth Amendment rights.  Binford also argues that his sentence should be vacated because it was enhanced based on the residual clause of the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(1), which the Supreme Court recently held is unconstitutionally vague, and because his sentencing-guidelines range was substantially increased based on an identical provision in the Sentencing Guidelines that is also void.

We **AFFIRM** the judgment of the district court with respect to Binford's convictions.  However, with respect to Binford's sentence, we **VACATE** the judgment of the district court and **REMAND** for reconsideration in light of the Supreme Court's recent decision in *Johnson v. United States*, 135 S. Ct. 2551 (2015).

# I. BACKGROUND

## A.    The Search and Questioning of Binford

In the fall of 2012, Detective Paul Kinal of the Oakland County Narcotics Enforcement Team (NET) and other NET officers utilized a confidential informant to make two controlled purchases of marijuana from Leon Binford, approximately two weeks apart.  The purchases were made in the parking lot of Binford's apartment building in Southfield, Michigan.  On both occasions, Kinal and other officers searched the informant before the purchase; gave him the money to make the purchase; listened as he called Binford to arrange the purchase; observed

Binford leave his apartment and meet the informant in the parking lot; observed a hand-to-hand transaction between the two; and tested the marijuana that the informant turned over immediately after the purchase. Based on the above, Kinal obtained a search warrant that authorized him to search Binford's apartment for drugs, firearms, and other evidence of drug trafficking. Because Binford had a history of gun-related or violent offenses, Kinal requested and received permission from his superiors to use the Special Entry and Response Team (SERT) to enter and clear the apartment.

On October 2, 2012, Kinal and four other NET officers, approximately ten members of the SERT team, and a canine team, executed the search warrant on Binford's apartment. The SERT officers – dressed in black tactical uniforms and equipped with helmets, handguns, rifles, and some wearing masks – made entry first by forcing the front door open with a large steel ram. Once inside, the SERT team observed Binford standing naked in the doorway of his master bedroom, ordered him to the ground, and handcuffed him behind his back. Kinal testified that Binford was "cooperative and compliant" and that, after officers made contact with him, he "posed no risk of any threat or assault." The SERT team also found Binford's girlfriend and two-year-old child in the bedroom and took them into the living room to sit on a couch during the search. Finally, the SERT team and canine team performed a protective sweep of the residence. After the sweep, which lasted no more than five or six minutes, the SERT team exited and Kinal and the NET officers entered to conduct the search of the apartment.

Once inside the apartment, Kinal took Binford into the bathroom attached to the master bedroom while the other NET officers began searching the apartment. Binford had a bed sheet or some other type of covering around him – which had been placed over him before Kinal entered the residence – but was otherwise unclothed and still handcuffed. Kinal, who measures 6'1" and weighs 230 pounds, also had his service handgun in a leg holster. However, he never removed it from the holster. Binford is approximately 5'10" and weighs 240 pounds.

Kinal testified that he decided to take Binford in the bathroom for privacy and because it was the quietest place in the apartment, citing the noise that is inherent in the execution of a search warrant. Kinal also stated that he planned to speak with Binford about the case and about working as a confidential informant, which needed to be kept between only Binford and Kinal.

Once inside the bathroom, which is a 6' x 5' room, Kinal closed the door and removed a balaclava (a type of mask) that hid his face and was marked "police." Binford was seated on the toilet and Kinal stood near the sink. Kinal testified that Binford immediately started apologizing about what was going on, but Kinal quickly directed him to stop so that he could be given *Miranda* warnings. Kinal also testified that he moved Binford's handcuffs to the front of his body after Binford stated that he would act appropriately and pose no threat to Kinal. Kinal then handed Binford a pen.

Kinal testified that he then presented Binford with a typed *Miranda* rights-and-waiver form and asked Binford if he could read and write. Binford answered in the affirmative. Kinal then asked Binford to read each numbered right on the form and, if he understood that right, to initial the corresponding number acknowledging this understanding. Kinal read the rights aloud to Binford; however, Kinal did not require that Binford read the rights aloud himself. Kinal witnessed Binford initial each right, and Binford testified that he understood everything on the *Miranda* form. Next, Binford signed the waiver section and handwrote "yes" under the question asking if he was willing to speak with Kinal and waive his rights. Kinal testified that he then questioned Binford. During the questioning, Binford admitted that: he sold small quantities of marijuana to pay his bills; he sometimes conducted the sales in the parking lot of his apartment building; there was a pistol in a boot on the top shelf of the master bedroom closet; he bought the pistol on the streets for protection; he knew he was not supposed to have a gun; and there was marijuana in a drawer or on the counter. In total, Kinal and Binford were in the bathroom for approximately fifteen to twenty minutes.

Regarding other details of the questioning, Kinal testified that he could not remember whether he told Binford that he was under arrest or detained; however, Kinal did tell him that he was the focus of the investigation and acknowledged that Binford would not have been free to leave. Further, Kinal testified that at that point he did not have a charge to arrest Binford on and that Binford was detained because "he was the focus of [Kinal's] investigation based on [Binford's] history and search warrant on hand." Kinal clarified that if he used the word "arrest," it was by mistake and not in line with his standard interviewing technique. Binford testified that he asked Kinal if he was under arrest and Kinal avoided the question and said they

would get to that later; but ultimately, Kinal never told him that he was under arrest in the apartment. Nevertheless, Binford testified that he *believed* that he was under arrest during the bathroom interrogation.

Kinal further testified that Binford was eager to become an informant, but Kinal never promised him anything in return for his cooperation. Kinal only told Binford that he could help him with the charges if he cooperated and, according to Binford's testimony, said something to the effect of "you help me, I'll help you." Kinal stated this occurred after Binford was Mirandized but may have been around the same time Binford gave his incriminating statements.

Binford testified that during the bathroom conversation Kinal never threatened Binford, that he never raised his voice, and that he was calm. Binford also testified that while Kinal did state that Binford's girlfriend could be held responsible if she knew what was going on, Kinal never made any threats to arrest Binford's girlfriend if Binford refused to speak with Kinal. Regarding Kinal's statement that he could help Binford if he cooperated, Binford testified that he believed this meant that if he told Kinal "something" Binford would get out of trouble and possibly not go to jail. However, Binford also testified that whenever he asked if he was going to jail, Kinal never provided a direct answer. Binford also testified that he gave his incriminating statements because he thought he was under arrest and due to his distressed and concerned state of mind. However, Binford testified that the fact that he was unclothed during the questioning did not cause him any concern or distress.

Upon leaving the bathroom, Kinal took Binford to the bedroom to assist in the retrieval of the pistol that Binford said was in the closet. At this point the bedroom was still being searched by another officer. After Binford told the officers that the gun was in black women's boots on the top shelf of the closet, the officers retrieved the weapon. The closet contained female clothing as well as a prescription bottle on the top shelf with Binford's name on it. The rest of the search, which lasted from thirty minutes to an hour and a half, uncovered approximately 42 grams of marijuana, $190 cash ($40 of which was in Binford's girlfriend's purse), and marijuana packaging devices. No ledgers or additional evidence of drug trafficking were recovered.

After the search and after being allowed to put on clothes, Binford was arrested and transported to jail.

**B.    Pre-trial, Trial, and Sentencing**

Binford filed pre-trial motions to suppress evidence obtained from the search.  He argued, among other things, that he was arrested in his home illegally without a valid arrest warrant.  He asked the court to suppress his incriminating statements under the exclusionary rule.  The district court denied his motion.  In doing so, the court found that the interrogation in the bathroom lasted a short time and that there was no evidence that it was prolonged or repeated.  The court noted that while Binford said he was scared, he did not say he was scared into making the statements.  Regarding Kinal's statement that he could help Binford if he cooperated, the court found that it did not amount to the level of police coercion required to suppress the statements.  Based on the totality of the circumstances, the court held that the police activity was not sufficient to and did not overcome Binford's will.  Finally, the court found that Binford knowingly and intelligently waived his *Miranda* rights.

The case then proceeded to a jury trial.  Binford was convicted of two counts, being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1), and possessing with intent to distribute marijuana under 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D).[1]  At sentencing, Binford received two enhancements, first under the ACCA, 18 U.S.C. § 924 (e), and second, using the career-offender enhancement under United States Sentencing Guideline § 4B1.1.  Under the ACCA, the mandatory minimum sentence is fifteen years imprisonment.  18 U.S.C. § 924(e).  Although Binford's qualification as a career criminal called for an enhanced advisory guideline range of 262-327 months, the district court followed the government's recommendation and departed downward to the mandatory minimum sentence of fifteen years (180 months) under the ACCA on the gun charge and imposed a concurrent sentence of one day on the drug charge.[2]

---

[1]Binford was found not guilty of the third count of the indictment, possession a firearm in furtherance of a drug trafficking crime.

[2]If no enhancements were applicable, the maximum penalty for being a felon in possession of a firearm would be ten years' imprisonment.  18 U.S.C. § 924(a)(2).

Binford filed a timely notice of appeal on May 13, 2014. We have jurisdiction over the instant appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## II. ANALYSIS

### A.    Suppression Issues

When reviewing a district court's decision on a motion to suppress, the appellate court reviews the district court's factual findings for clear error and its legal conclusions de novo. *United States v. Gill*, 685 F.3d 606, 609 (6th Cir. 2012). The appellate court may affirm on any ground supported by the record and may consider trial evidence in addition to evidence considered at the suppression hearing. *Id*. "When a district court has denied a motion to suppress, this Court reviews the evidence in the light most likely to support the district court's decision." *United States v. Adams*, 583 F.3d 457, 463 (6th Cir. 2009) (internal quotation marks omitted).

### 1.    Binford's Detention

The district court was correct in finding that Binford's detention did not violate his Fourth Amendment rights. First, Binford's detention was permissible under *Michigan v. Summers*, 452 U.S. 692 (1981), and its progeny. Second, Binford's detention did not amount to an illegal arrest.

In *Michigan v. Summers,* the Supreme Court held that during the execution of a search warrant for contraband, police officers have the "limited authority to detain the occupants of the premises while a proper search is conducted." 452 U.S. at 705. Similarly, "[a] brief investigatory detention by an officer with a reasonable suspicion of criminal activity is not an unreasonable seizure." *United States v. Hopson*, 134 F. App'x 781, 789 (6th Cir. 2004). Moreover, the Supreme Court has held that when officers execute a search warrant, they may question occupants during the search so long as the questioning does not prolong the search. *Muehler v. Mena*, 544 U.S. 93, 99-101 (2005).

Therefore, Kinal had the authority under *Summers* to detain Binford incident to the search warrant. Further, because the two controlled purchases of marijuana gave Kinal reasonable

suspicion of criminal activity,[3] he also had the authority to subject Binford to a brief investigatory detention, which is what occurred when Kinal took Binford into the bathroom during the search. Moreover, because the bathroom questioning did not prolong the search, it was permissible under *Muehler*. 544 U.S. at 99-101. Finally, while it is true that "special circumstances, or possibly a prolonged detention" might render a detention during the execution of a search warrant unreasonable, *Summers*, 452 U.S. at 705 n.21, those circumstances do not exist in this case.

While Binford does not dispute the officers' authority to detain him while the search was conducted, Binford argues that his Fourth Amendment rights were violated when the police "took advantage of the search warrant to isolate and interrogate him, despite not having an arrest warrant or probable cause."[4] Specifically, he argues that by questioning him in the bathroom, Kinal overstepped the bounds of *Summers* because "he exploit[ed] Binford's detention in order to gain more information." Binford reasons that when Kinal took Binford into the bathroom for questioning, "Kinal had no 'reasonable suspicion' justifying a greater detention than what was allowed by the search warrant itself."

In support, Binford cites *United States v. Fountain*, 2 F.3d 656 (6th Cir. 1993), *overruled on other grounds, Trepel v. Roadway Express, Inc.*, 194 F.3d 708, 717 (6th Cir. 1999), and argues that his detention in this case was greater than this court allowed in *Fountain*. In that case, federal agents executed a search warrant on a residence for firearms, drugs, and drug paraphernalia. *Fountain*, 2 F.3d at 659-60. During the search, a defendant, McEaddy, and three other occupants were initially handcuffed and detained in the living room. *Id.* After the search uncovered firearms and narcotics, McEaddy was separated from the other occupants and taken to an open and adjoining dining room area for an "investigative" detention and questioning. *Id.*

---

[3]Not only did Kinal have reasonable suspicion, he also had probable cause to arrest as evidenced by the fact that the search warrant itself was based on the two controlled purchases. *See Summers*, 452 U.S. at 701 ("Of prime importance in assessing the intrusion is the fact that the police had obtained a warrant to search respondent's house for contraband. A neutral and detached magistrate had found probable cause . . . .").

[4]The government does not dispute that Binford's detention was a seizure within the meaning of the Fourth Amendment.

On appeal, we affirmed the district court's denial of the defendant's motion to suppress. We considered "whether the district court correctly concluded that the continued detention of McEaddy at the conclusion of the search was supported by reasonable suspicion." *Id*. at 665 (internal quotations omitted). To that end, we noted that "[t]o establish that the detention, which was not supported by probable cause, was reasonable, the government must show: 1) that the seizure was based on 'reasonable suspicion' of criminal activity; and 2) that the investigative measures used were the least intrusive means reasonably available to dispel the officer's suspicion in a short period of time." *Id*. (internal citations omitted). Otherwise stated, the government must show that "under the totality of the circumstances, the agents diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly . . . ." *Id*. (internal quotations and citations omitted). Finally, we held:

> McEaddy . . . does not claim the agents did not have "reasonable suspicion." McEaddy argues that the detention after the search concluded and before the agents had probable cause to arrest was an exploitation of the initial *Summers* detention. We disagree. Once the search of the premises was completed and resulted in the discovery of drugs and firearms, the agents had reasonable suspicion to focus on any occupant who was present in the home voluntarily or purposefully. Although McEaddy was already handcuffed at this point, the use of handcuffs does not necessarily turn an encounter into an arrest for which probable cause is required. McEaddy *was not removed from the home, placed in a squad car, or taken to the police station*. Rather, the agents took McEaddy into the adjoining dining room, where he was briefly questioned. Although the intrusion was significant, it was reasonable in light of the significant law enforcement interests and the physical surroundings of the encounter.

*Id*. at 665-66. (emphasis added) (citations omitted).

Binford asserts that in contrast to the facts of *Fountain*, "when Binford was taken to the bathroom the search of the apartment was ongoing, and Kinal had no 'reasonable suspicion' justifying a detention greater than what was allowed by the search warrant itself." Additionally, Binford claims that "the twenty-minute interrogation was extremely intrusive, isolating Binford and forcing him to sit naked in a small bathroom with an armed officer blocking the only exit." Thus, according to Binford, his bathroom detention exceeded what was allowed under *Summers*, as discussed by this court in *Fountain*.

Binford's arguments misconstrue *Fountain*.  As stated in *Fountain*, "a valid search warrant implicitly carries with it the limited authority to detain the 'occupants' of the premises while police conduct the search." 2 F.3d at 661 (citing *Summers*).  Further, Kinal had reasonable suspicion that Binford was engaged in criminal activity based upon the two controlled marijuana buys.  Additionally, Kinal's reasonable suspicion was not required to arise from evidence uncovered during the search; rather, it is permissible that his reasonable suspicion was founded upon the marijuana sales.  This conclusion is based on this court's holding in *United States v. Hopson*, 134 F. App'x 781, 789 (6th Cir. 2004), that a police officer with a valid search warrant to enter into and search a person's residence, but lacking an arrest warrant, may arrest that person in his home based solely on pre-existing probable cause (i.e., probable cause supporting the search warrant itself as opposed to probable cause based on evidence later uncovered during the search).  In such a situation, if an arrest may be made based on pre-existing probable cause, it must logically follow, and we now hold, that a police officer's authority to detain an occupant *during a Summers detention* may be based on pre-existing reasonable suspicion.  Thus, in this case, Kinal had reasonable suspicion based on the prior marijuana sales.

Second, Binford remained in his apartment during the questioning and was not placed in a police cruiser or taken to police headquarters.  As in *Fountain*, Binford was merely and permissibly moved to another room inside his home, namely, the bathroom connected to the bedroom where he was initially detained.[5]  Third, and also as in *Fountain*, based on the totality of the circumstances, it is clear that Binford's bathroom questioning was brief and reasonable as Kinal "diligently pursued a means of investigation that was likely to confirm or dispel [his] suspicions quickly." *Fountain*, 2 F.3d at 665.  Kinal took Binford to an adjoining room for questioning, which lasted no more than twenty minutes and ended before the search was complete.

---

[5]While Binford argues that it was the totality of the circumstances of the bathroom detention that caused it to exceed the limits of *Summers*, Binford's attorney stated at oral argument that their theory relies heavily on "the location" of the questioning, specifically, "the action of moving Mr. Binford from a relatively open area [the bedroom] where he could see his family and moving him and isolating him into a confined space [the bathroom]." Binford cites no authority to support this contention, and we reject it.  Simply put, there is no legal authority that requires a suspect to be detained in a specific room inside the residence where he or she is found.

However, even if Kinal did not have reasonable suspicion or probable cause, Binford's argument fails because it relies on the mistaken assumption that Binford's questioning in the bathroom was a separate Fourth Amendment seizure, distinct from his initial detention in the bedroom. The Supreme Court has made clear that the questioning of an occupant during the execution of a search warrant does not constitute a "discrete Fourth Amendment event" so long as the questioning does not prolong the search. *Muehler*, 544 U.S. at 100-01. Where there is no prolonging of the search, and thus, no additional Fourth Amendment event (i.e., seizure), officers are not required to have "independent reasonable suspicion" before questioning an occupant. *Id*. Therefore, because it is not disputed that Binford's questioning in the bathroom did not prolong the search, it was not a separate seizure, and Kinal was not required to have additional reasonable suspicion to question Binford in the bathroom.

Because Binford was permissibly detained during the execution of the search warrant, the detention did not amount to an unlawful arrest without probable cause. Therefore, because Binford's Fourth Amendment rights were not violated, the district court did not err in declining to suppress on that ground either Binford's incriminating statements and the gun obtained during the search.

### 2.    Voluntariness

The district court also did not err in admitting Binford's incriminating statements at trial. The court correctly found that Binford's Fifth Amendment rights were not violated, because his waiver of his *Miranda* rights and his subsequent statements were made voluntarily, knowingly, and free of police coercion.

Binford disputes the district court's rulings and argues that he was coerced by statements from Kinal that amounted to implied and "illusory promises of leniency." Specifically, Binford identifies the following statements: (1) Kinal's offer to help Binford if he cooperated; (2) Kinal's statement to Binford, "you help me, I help you;" and (3) Kinal's refusal (upon inquiry by Binford) to tell Binford whether he was going to jail. Additionally, Binford argues there existed a "coercive atmosphere" that – when combined with Kinal's alleged promises of leniency – required the exclusion of his incriminating statements at trial.

"Statements made by a defendant in response to interrogation while in police custody are not admissible unless the defendant has first been apprized of the constitutional right against self-incrimination and has validly waived this right." *United States v. Cole*, 315 F.3d 633, 636 (6th Cir. 2003) (citing *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966)). Such a waiver must be made voluntarily and free of any coercion. *See Moran v. Burbine*, 475 U.S. 412, 421 (1986). Similarly, an accused's confession must be "made freely, voluntarily and without compulsion or inducement of any sort." *Haynes v. Washington*, 373 U.S. 503, 513 (1963). The government bears the burden of proving – by a preponderance of the evidence – the voluntariness of both an accused's *Miranda* waiver and confession. *See Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986).

"The test for whether a *Miranda* waiver is voluntary is essentially the same as the test for whether a confession is voluntary." *United States v. Reddit*, 87 F. App'x 440, 445 (6th Cir. 2003) (citing *Connelly*, 479 U.S. at 169-70). In determining whether a confession is involuntary due to police coercion, this court employs a three-step analysis: "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; (iii) and the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statements." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999).

### a.      Incriminating statements

Applying the *Mahan* test, we must first determine whether the police activity was objectively coercive. Binford argues that Kinal's statements "were objectively coercive because they implied that Binford could escape prosecution by waiving his right to remain silent," and cooperating as a confidential informant. Further, Binford argues that Kinal's "refusal to make a more specific promise" – referring to Kinal's refusal to tell Binford if he was going to jail – caused all of Kinal's statements to become, collectively, an illusory promise of leniency. Binford's arguments fall short for several reasons.

Even if Kinal's statements, which at most imply Kinal could help Binford with charges if Binford cooperated, amounted collectively to an implied promise of leniency, it was not objectively coercive. While it is true that in some situations, "[p]olice promises of leniency . . .

can be objectively coercive," generally, such promises are coercive only "if they are broken or illusory," *United States v. Johnson*, 351 F.3d 254, 261-62 (6th Cir. 2003), and "promises to recommend leniency and speculation that cooperation will have a positive effect do not make subsequent statements involuntary." *United States v. Delaney*, 443 F. App'x 122, 129 (6th Cir. 2011) (citation and internal quotation marks omitted). Further, "[a] promise of leniency in exchange for cooperation . . . usually [is] permissible." *Id.* Therefore, Kinal's "promise of leniency" in exchange for cooperation was only objectively coercive if it was broken or illusory.

"[A]n illusory promise is a statement in the form of a promise, but lacking its substance in that it does not actually commit the police to undertake or refrain from any particular course of action." *Johnson*, 351 F.3d at 262 n.1; *see also United States v. Siler*, 526 F. App'x 573, 577 (6th Cir. 2013) (stating that a promise is also "problematic if a police officer leads a defendant to believe that he will receive lenient treatment when this is quite unlikely") (internal quotations and citations omitted). Here, Kinal's promise was to help Binford with charges in the event Binford cooperated, a promise which Kinal testified that he had the authority to make as a drug-task-force detective. As was the case in *Johnson*, Kinal's promise "was not an illusory promise as it actually committed [Kinal] to undertake a specific course of action in return for [Binford's] cooperation, as surely [Binford] would be arguing here if" Binford had cooperated and Kinal had not helped him with the charges. 351 F.3d at 262. Additionally, there is no evidence, and Binford does not allege, that Kinal broke his promise.

Binford's reliance on *Siler* to show objective coercion is misplaced. There, this court dealt with multiple egregious and illusory promises of leniency, which were ultimately broken, very distinct from Kinal's statements in this case. In explaining our holding, we stated:

> Here, the promises went too far and [the investigator's] statements to Siler were coercive. During the interviews, when Siler asked [the investigator] what would happen if he provided information on the gun, [the investigator] was very clear that no one would be charged and that Siler did not need to "worry about it." Furthermore, [the investigator] clearly told Siler that he, [the investigator], was the one who wrote the warrants, indicating that [the investigator] influenced which cases the prosecutors would pursue and whom the police would arrest. These explicit statements were legally inaccurate—there is no evidence in the record that would establish [the investigator] had authorization to bind either the District Attorney or federal prosecutors. Furthermore, [the investigator] broke his

promise when he turned Siler over to federal prosecutors who charged Siler with a weapons violation . . . . [The investigator's] actions and statements were objectively coercive.

*Siler*, 526 F. App'x at 576.  Because it is clear that Kinal's promise does not approach the level of coercion displayed by the investigator in *Siler*, Binford's reliance on that case is unavailing.

In summary, we hold that Kinal's promise of leniency was not objectively coercive, and thus, Binford made his incriminating statements voluntarily.  As such, we need not discuss the second and third parts of the *Mahan* test.  *See Connelly*, 479 U.S. at 167 (holding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'").  Accordingly, because Binford's incriminating statements were not obtained in violation of his Fifth Amendment rights, the district court did not err in denying Binford's motion to suppress the statements.

### b.     *Miranda* waiver

On the same grounds that he alleges his incriminating statements were involuntary, Binford also challenges the voluntariness of his *Miranda* waiver.  It is undisputed that Binford was advised of his rights, that he understood his rights, and that he signed the *Miranda* form acknowledging his understanding and waiver of those rights.  The government bears the burden of proving, by a preponderance of the evidence, that *Miranda* rights were voluntarily and knowingly waived.  *Connelly*, 479 U.S. at 168-69; *Miranda*, 384 U.S. at 475.

As stated above, "[t]he test for whether a *Miranda* waiver is voluntary is essentially the same as the test for whether a confession is voluntary."  *Reddit*, 87 F. App'x at 445 (citing *Connelly*, 479 U.S. at 169-70).  Also as explained above, the district court did not err in holding that Binford's incriminating statements were voluntary and not the product of police coercion.  For the same reasons, the district court did not err in finding that Binford's *Miranda* waiver was voluntary.

The waiver must also be made knowingly.  Again, Binford testified that he understood his rights.  Further, when asked by Kinal whether he could read and write, Binford answered in the affirmative, and proceeded to sign a form acknowledging his knowing and voluntary waiver

of his rights. Additionally, Binford has significant experience with the criminal-justice system. For these reasons, it is clear Binford's waiver was made knowingly.

Finally, because neither Binford's incriminating statements nor the firearm were obtained in violation of Binford's Fourth or Fifth Amendments rights, the exclusionary rule does not apply. Similarly, because the district court correctly admitted the statements and gun, we need not evaluate whether their admission was harmless.

Thus, because the district court did not err in denying Binford's motion to suppress, we affirm Binford's convictions.

**B.      Sentencing Issues**

Binford received two enhancements at sentencing, first under the ACCA, 18 U.S.C. § 924 (e), and second, under the career-offender enhancement in Guideline §4B1.1. The ACCA enhances the sentence of a defendant who is convicted of being a felon in possession of a firearm and has at least three prior convictions for "violent felonies." § 924(e). The Sentencing Guidelines increase the sentencing-guidelines range of a defendant who has "at least two prior felony convictions of . . . a crime of violence." USSG § 4B1.1(a). Binford was found to qualify under both enhancements due to three prior felony convictions, only two of which Binford has ever challenged: one for second-degree burglary and one for fourth-degree burglary, both Ohio convictions.[6] The district court held that both burglary convictions qualified as crimes of violence under the residual clauses of both the ACCA and Sentencing Guidelines, rather than the enumerated clauses.[7] However, due to reasons set forth below, the government concedes that Binford's fourth-degree burglary conviction under Ohio law does not qualify as a violent felony under the ACCA or as a crime of violence under the career offender provision of the guidelines. Therefore, because the ACCA enhancement requires three prior qualifying convictions and

---

[6]The third and uncontested qualifying conviction was for a felony assault offense.

[7]The government seems to challenge this but as Binford correctly points out, during the sentencing hearing, the government relied on United States v. Price, 559 F. App'x 496, 499 (6th Cir. 2006), which held that the Ohio second-degree burglary statute "proscribes conduct broader than the definition of generic burglary," and, therefore, a violation of that statute only "qualifies as a violent felony under the 'residual clause' of the ACCA."

because the government now argues Binford only has two prior qualifying convictions,[8] the government has also conceded that Binford's ACCA enhancement was not proper and should be vacated.

Therefore, the only remaining issue before the court is whether Binford's second-degree burglary conviction constitutes a "crime of violence" under the residual clause of the career offender enhancement, USSG §4B1.2(a)(2). During the pendency of the appeal in this case, the Supreme Court held in *Johnson*, that the identically worded residual clause of the ACCA is void for vagueness.[9] *Compare* USSG § 4B1.2(a)(2), *with* 18 U.S.C. § 924(e)(2)(B)(ii). This court has interpreted both residual clauses identically. *See United States v. Ford*, 560 F.3d 420, 421 (6th Cir. 2009); *United States v. Houston*, 187 F.3d 593, 594-95 (6th Cir. 1999). Following *Johnson*, the Supreme Court has vacated the sentences of offenders who were sentenced under the Guidelines' residual clause. *See United States v. Maldonado,* 581 F. App'x 19, 22-23 (2d Cir. 2014), *vacated*, No. 14-7445, 135 S. Ct. 2929, 2015 WL 2473524, at *1 (U.S. June 30, 2015); *Beckles v. United States,* 579 F. App'x 833, 833-34 (11th Cir. 2014), *vacated,* No. 14-7390, 135 S. Ct. 2928, 2015 WL 2473527, at *1 (U.S. June 30, 2015); *see also Wynn v. United States,* 135 S. Ct. 2945 (2015) (vacating a Sixth Circuit order, which denied habeas relief based on a predicate offense qualifying under the residual clause of the career offender enhancement).

Therefore, we vacate the judgment as to Binford's sentence and remand for reconsideration in light of *Johnson*.

## III. CONCLUSION

For the above reasons, we **AFFIRM** the district court's denial of Binford's suppression motion and uphold his convictions. However, we **VACATE** Binford's sentence and **REMAND** for reconsideration in light of *Johnson*.

---

[8]Again, the uncontested assault conviction and second-degree burglary conviction.

[9]Because *Johnson* is a constitutional decision, it applies to cases pending on appeal. *See Griffith v. Kentucky*, 479 U.S. 314, 328 (1987).