NOT RECOMMENDED FOR PUBLICATION
File Name: 17a0298n.06

No. 16-3056

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **FILED** |
| | ) | May 30, 2017 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| JERRY L. WELLS, JR., | ) | DISTRICT OF OHIO |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

**BEFORE: BATCHELDER, ROGERS, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Reserving the right to challenge the district court's suppression ruling, Jerry L. Wells, Jr. pleaded guilty to four counts of possessing heroin with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), one count of possessing 3,4-methylenedioxymethamphetamine (MDMA, commonly known as ecstasy) with intent to distribute, also in violation of in violation § 841(a)(1) and (b)(1)(C), one count of possessing marijuana with intent to distribute, in violation of § 841(a)(1) and (b)(1)(D), and one count of felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Wells now appeals, asserting that the district court improperly denied his motion to suppress his post-arrest statements and the contents of his cell phone. We find no error in the district court's ruling on Wells's post-arrest statements, and we make no ruling as to the phone because Wells abandoned that issue below. We therefore **AFFIRM**.

**I.**

**A.**

In February 2014, police in Elyria, Ohio, began investigating Wells's involvement in narcotics trafficking.  As part of that investigation, a confidential informant made controlled purchases of heroin from Wells at a house on Case Avenue in Elyria on February 18, 20, and 21. On the basis of those purchases, police obtained a warrant to search the Case Avenue house for evidence of drug crimes.  Elyria officers executed the search warrant at approximately 7:00 pm on February 21 and discovered, among other things, heroin, MDMA, dozens of marijuana plants, and a handgun.

While officers were searching the house, other officers spotted Wells driving nearby and stopped him.  The facts surrounding the stop are not in the record and the basis for the stop is unclear.  The officers who stopped Wells brought him to the Case Avenue house.  There, Wells was told he was under arrest on drug charges.  A detective advised Wells of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and Wells proceeded to make inculpatory statements, including that he lived at the house, that the handgun was his, and that the brown substance police found in several bags was heroin.

Officers later transported Wells to the police station.  He was again advised of his *Miranda* rights and waived them.  During a recorded interview, Wells made additional inculpatory statements, admitting that the marijuana plants were his, that he intended to harvest them and sell the marijuana, and that he had recently sold Fentanyl and ecstasy.  Wells also repeated his admissions that he lived at the Case Avenue house and the handgun was his. At some point between the time Wells was stopped and the time he was formally booked at the police station, a cell phone was seized from him, but it is not clear from the record when that occurred.

-2-

B.

The instant indictment was filed on April 22, 2014, charging Wells with possession with intent to distribute heroin based on the three controlled buys, possession with intent to distribute heroin, MDMA, and marijuana based on the drugs found in the search of the Case Avenue house, and being a felon in possession of a firearm based on the gun found in the search. Wells filed a motion to suppress the physical evidence.

1.

Wells initially argued that the traffic stop was unlawful because he was not stopped in the area of the Case Avenue house and there was no independent probable cause to arrest him.[1] As a result, asserted Wells, "all evidence seized during his detention and the search of his residence" should be suppressed. (R. 27, PID 95.) Wells did not assert that his statements to police should be suppressed.

In support of his argument, Wells attached an unsigned incident report, apparently prepared by Elyria police sometime after the events at issue. In relevant part, the report states:

> On 02/21/2014 at approximately 1900hrs, Detectives . . . executed the search warrant . . . . As a result, Detectives arrested/charged Jerry L. Wells . . . . It should be noted that Wells had been detained during a traffic stop for driving under suspension . . . during the execution of [the] search warrant. Lorain Police Dept. was also actively investigating and attempting to locate Wells regarding his involvement in a missing juvenile/kidnapping case . . . . Wells was ultimately escorted back to [the Case Avenue house] where he was placed under arrest for multiple drug charges that resulted from the search of the home.

(R. 27-1, PID 97.) The report does not reveal which officers stopped Wells, and it contains no other information about the alleged traffic violation or Wells's alleged involvement in the

---

[1] Wells also claimed that the search warrant was invalid and improperly executed, and that a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), was necessary. The district court disagreed, and Wells does not raise those issues on appeal.

missing-juvenile case. Nor does the report explain why the officers who stopped Wells transported him to the Case Avenue house.

In its response brief, the government told a different story. "This was not a routine traffic stop," the government explained, nor, it asserted, was it related to the search of the Case Avenue house. (R. 30, 116–17.) Rather, according to the government, Wells was stopped pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), because Wells "was suspected to have involvement in" the Lorain "missing juvenile/kidnapping case." (R. 30, PID 116.) In this telling, it was only "[d]uring the stop" that "officers learned that Wells was driving under suspension." (*Id.* at 117.) Thus, "[h]e was ultimately escorted back to his residence [] because he could not drive himself." (*Id.*) And—apparently arriving by coincidence just as officers were searching his house— "[b]ased on the evidence discovered during the search . . . Wells was arrested for drug charges." (*Id.*) Based on this narrative, the government argued that both the initial stop of Wells and his subsequent arrest were proper. However, the government did not provide an affidavit supporting this version of events, or shed further light on the missing-juvenile case or the basis for the belief that Wells was involved. Nor, aside from a single reference to the incident report, which does not support this account, did it cite any evidence.

At a pretrial hearing, the district court asked the government about the lack of evidentiary support for its position. This time, the government responded that it need not prove the validity of the initial stop because the government's evidence was all discovered during the search of the Case Avenue house. Wells responded by raising, for the first time, his inculpatory statements and suggesting those statements were fruits of the allegedly unlawful initial stop. After further discussion, the court ordered Wells to submit a supplemental brief addressing the legality of the

initial stop in light of the government's version of events, and explaining exactly what evidence should be suppressed.

In his supplemental brief, Wells asked the district court to suppress "statements made during the search of his residence and statements made at the Elyria Police station," as well as the cell phone obtained "during his arrest." (R. 35, PID 145.) Wells reiterated that he had been the subject of an "illegal traffic stop and arrest," (*id.*), but made no response to the government's assertion that he was stopped pursuant to *Terry* and in relation to the Lorain missing-juvenile case. Focusing on *Brown v. Illinois*, 422 U.S. 590 (1975), and *United States v. Watson*, 489 F. App'x 922 (6th Cir. 2012), Wells argued that there was insufficient attenuation between the initial stop and its fruits to make his post-arrest statements and the seized cell phone admissible.[2]

The government responded by reiterating that officers had made a valid *Terry* stop related to the Lorain missing-juvenile investigation. Once again, however, the government produced no evidence to support that position. Further, the government changed its story on a key fact, reasserting—in direct contradiction to its more recent position, and with no explanation for the change—that prior to the stop, "officers knew that Wells was operating a motor vehicle without a license," thus providing an independent basis for the stop. (*Compare*, R. 30, PID 117, *with* R. 36, PID 154.) Separately, the government argued that because Wells had sold heroin to the confidential informant on three occasions, "any argument of an invalid stop and detention [was] moot," "even though this was not the initial reason for the stop of Wells." (R. 36, PID 153.) Finally, the government argued, based primarily on *New York v. Harris*, 495 U.S. 14

---

[2] Wells apparently made statements to police during the initial stop as well, but the government represented that it did not intend to introduce any evidence related to those statements, so they are not part of the suppression dispute.

(1990), that even if the initial stop was unlawful, Wells's statements were not the fruits of the stop, but of his lawful re-arrest on drug charges.

The district court heard argument at the final pretrial hearing. At the hearing, the government articulated yet another variation on its narrative. The government proffered that, if called, Detective Todd Straub, the lead investigator in Wells's case, would testify that: (1) he knew prior to the execution of the search warrant that Wells did not have a valid driver's license; (2) he "had been contacted by the Lorain Police Department," whose officers were "interested in looking for a juvenile," and had "given the address" of a house on Denison Avenue which was "in close proximity to" the Case Avenue house; (3) officers patrolling on Denison Avenue and "in the area of Case . . . at some point . . . saw Jerry Wells operating a motor vehicle;" (4) he told the officers "who were out on the scene that Jerry Wells did not have a proper driver's license, and therefore a stop could be made;" and (5) "then essentially a stop was made." (R. 57, PID 352–53.) However, the government did not explain the basis of Straub's assertion about the status of Wells's license.

As to the cell phone, the government was unable to say when it had been seized. Wells's counsel asserted that the phone was seized during the traffic stop, before Wells was transported to the Case Avenue house and before he was re-arrested on drug charges.

In ruling on Wells's motion, the district court noted the absence of any evidence related to the initial stop, and therefore assumed the stop was illegal. After considering *Brown* and *Harris*, the court stated "if you have an independent basis for an arrest subsequent to" the unlawful stop, then "the statement is not to be excluded merely because there was the original" unlawful stop. (R. 57, PID 370.) The court then concluded that Wells's post-arrest statements "should not be suppressed because they don't bear a sufficiently close relationship to the

underlying illegality." (*Id.* at 370–71.)  The court declined, however, to make a ruling as to the cell phone, explaining that since there was disagreement as to when it was recovered, an evidentiary hearing would be necessary to determine when the phone was seized and, if it was seized during the initial stop, whether the stop was actually unlawful.

2.

After Wells's request to suppress his post-arrest statements was denied, but before an evidentiary hearing to address the cell phone was held, Wells entered into a plea agreement with the government.  Pursuant to that agreement, Wells pleaded guilty to all the charges against him while preserving his right to raise the suppression issues on appeal.  The district court subsequently entered judgment and sentenced Wells to 120 months' imprisonment on the heroin and MDMA counts and 125 months' imprisonment on the marijuana and firearm counts, all to be served concurrently.  This timely appeal followed.

**II.**

Wells argues, as he did below, that his initial stop by police was unlawful because he was not in the area of the Case Avenue house when the search warrant was executed and the police lacked probable cause to stop him.  He further argues that the district court misapplied *Brown*, and should have suppressed his post-arrest statements and the cell phone because they were fruits of the unlawful stop.  We conclude that the district court did not err in denying suppression of Wells's post-arrest statements and that the questions regarding the cell phone are not properly before us.

A.

In evaluating a district court's denial of a motion to suppress, we review "the district court's factual findings for clear error and its legal conclusions de novo."  *United States v. Binford*, 818 F.3d 261, 267 (6th Cir. 2016) (citing *United States v. Gill*, 685 F.3d 606, 609 (6th

Cir. 2012)). We "may affirm on any ground supported by the record" and we "review[] the evidence in the light most likely to support the district court's decision." *Id.* (quoting *United States v. Adams*, 583 F.3d 457, 463 (6th Cir. 2009)).

It was the government's burden to justify the traffic stop. *Florida v. Royer*, 460 U.S. 491, 500 (1983). Because the government did not present any evidence regarding which officers stopped Wells, why they did so, or what they knew about Wells at the time, the district court assumed that the stop was illegal, and we do as well. "The illegality of the stop, however, does not end the suppression analysis." *United States v. Gross*, 662 F.3d 393, 401 (6th Cir. 2011). We must decide whether Wells's statements "must be suppressed under the exclusionary rule." *Id.*

As we explained in *Gross*,

> [t]he animating purpose underlying the exclusionary rule is the deterrence of unlawful government behavior. The Supreme Court has declined to adopt a 'per se', [sic] or 'but for,' rule that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest. Rather, the indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality.

662 F.3d at 401 (citations and internal quotation marks omitted).

When the evidence in question is the fruit of illegal conduct, a multi-factor analysis is necessary to determine whether the connection between the illegal conduct and evidence subsequently obtained has "'become so attenuated as to dissipate the taint.'" *Brown*, 422 U.S. at 598 (quoting *Wong Sun v. United States*, 371 U.S. 471, 491 (1963)). On the other hand, "attenuation analysis is only appropriate where, as a threshold matter, courts determine that 'the challenged evidence is in some sense the product of illegal governmental activity.'" *Harris*,

495 U.S. at 19 (quoting *United States v. Crews*, 445 U.S. 463, 471 (1980)). Wells relies on *Brown*; the government relies on *Harris*.

1.

In *Brown*, police arrested the defendant without a warrant and without probable cause. 422 U.S. at 591. After being transported to a police station and being advised of his *Miranda* rights, the defendant made inculpatory statements. *Id.* at 594–95. The Court held that *Miranda* warnings alone are not sufficient to break "the causal connection between the illegality and the confession." *Id.* at 603. Instead, the Court prescribed a multi-factor test that takes into account voluntariness, "the temporal proximity of the arrest and the confession," any "intervening circumstances," and, "the purpose and flagrancy of the official misconduct." *Id.* at 603–04 (footnotes and citations omitted); *see Gross*, 662 F.3d at 401. No single factor is dispositive. *Gross*, 662 F.3d at 401–02 (citing *Brown*, 422 U.S. at 603). Applying this test, the *Brown* Court held the defendant's statements inadmissible because his "first statement was separated from his illegal arrest by less than two hours," "there was no intervening event of significance whatsoever," and "the illegality . . . had a quality of purposefulness," because the officers had arrested the defendant purely to question him in connection with a murder investigation "in the hope that something might turn up." *Brown*, 422 U.S. at 604–05.

In *Harris*, by contrast, police had probable cause to arrest the defendant for murder, but did so in his home without a warrant in violation of *Payton v. New York*, 445 U.S. 573 (1980). *Harris*, 495 U.S. at 15–16. The defendant received *Miranda* warnings while still in his home and then confessed to the murder. *Id.* at 16. The defendant later signed a written inculpatory statement after additional *Miranda* warnings at the police station. *Id.* Only the second, written statement was before the Court, which found it was not obtained as a result of the illegal arrest.

*Id.* at 16–20. As the Court explained, while statements made during the course of the arrest, which was executed in violation of *Payton*, were properly suppressed, statements made later at the police station were admissible because police could have obtained them regardless where the arrest occurred. *Id.* at 18–20. The Court emphasized that the officers did have probable cause to arrest the defendant, and therefore while his *arrest* inside his house without a warrant was unlawful, his continued *detention* was not. *Id.* at 18.

The presence of probable cause was the key point on which the *Harris* Court distinguished *Brown*. *See id.* at 18–19. As the Court explained, when police make an arrest without probable cause, the need for attenuation analysis "may be assumed" because "the illegality is the absence of probable cause and the wrong consists of the police's having control of the defendant's person at the time he made the challenged statement." *Id*. at 19 (citation and internal quotation marks omitted).

The probable cause inquiry is based on "the facts *known to the arresting officer* at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (emphasis added). Here, the record does not reveal the identity of the officers who stopped Wells's vehicle, why they did so, or what, if anything, they knew about Wells's involvement in drug trafficking, the Lorain missing-juvenile case, or the status of Wells's driver's license. Again, we assume that the officers who stopped Wells did not have probable cause to do so.

2.

Assuming that Wells was unlawfully arrested at the scene of the traffic stop, we turn to the attenuation analysis: voluntariness, temporal proximity, intervening circumstances, and "the purpose and flagrancy" of the violation. *Brown*, 422 U.S. at 603–04 (footnotes and citations

omitted); *see Gross*, 662 F.3d at 401. Wells does not argue that his statements were anything other than voluntary, so we need not discuss that factor in detail.

*Temporal Proximity*. "Courts have found that, standing alone, as little as two hours of illegal detention to as many as six hours were insufficient to purge the taint" of an unlawful detention. *Watson*, 489 F. App'x at 928 (citations omitted); *compare, e.g., Wong Sun*, 371 U.S. at 491 (two days, attenuation found); *United States v. Akridge*, 346 F.3d 618, 627–29 (6th Cir. 2003) (several weeks, attenuation found); *Gross*, 662 F. 3d at 402 (two months, attenuation found), and *United States v. Jackson*, 172 F.3d 874 (6th Cir. 1998) (unpublished) (one day, attenuation found), *with Brown*, 422 U.S. at 604 ("less than two hours," no attenuation), and *United States v. Williams*, 615 F.3d 657, 669 (6th Cir. 2010) ("only seconds," no attenuation).

Analyzing temporal proximity in this case is made difficult by the sparse record, which reveals only that the search of the Case Avenue house began at approximately 7:00 pm, and that Wells was stopped and transported to the house while the search was ongoing. The record contains no information, though, as to how long after the search began Wells was stopped, how long he was detained before he was transported to the house, or when he made his first inculpatory statement. Nor is there evidence (or even unsupported representations) as to what time Wells was transported to the police station or when he made his second inculpatory statement. On appeal, Wells says only that "little time passed between the stop and [his] statements." (Appellant's Br. at 13.) The government does not address temporal proximity at all. After listening to the parties' arguments below, the district court characterized the temporal proximity of the initial stop to Wells's statements at the Case Avenue house as "very close," and concluded that "in terms of time there isn't much" to support an attenuation argument. (R. 57, PID 360.) Nothing in the record suggests the district court was incorrect on this point.

*Intervening Circumstances*.  "[T]he type of intervening events that serve to attenuate police misconduct are those that sever the causal connection between the illegal arrest and the discovery of the evidence."  *United States v. Shaw*, 464 F.3d 615, 628–29 (6th Cir. 2006) (brackets removed) (quoting *United States v. Reed*, 349 F.3d 457, 464 (7th Cir. 2003)).  Here, the district court found intervening circumstances weighed in favor of attenuation, citing the contraband discovered at the Case Avenue house, and that Wells was "held for violation of the drug laws."  (R. 57, PID 369–70.)  The district court's factual finding that Wells was ultimately held as a result of the contraband found in his house is clearly correct.

The district court reasoned that "if [police] have an independent basis for an arrest subsequent to the illegal activity"—i.e. the unlawful stop—"the statement is not to be excluded." (*Id.* at 370.)  In some circumstances, that is true.  *See Rawlings v. Kentucky*, 448 U.S. 98, 108 (1980) (where defendant's inculpatory statements were "spontaneous reactions to the discovery of his drugs" during an illegal detention, intervening circumstances supported attenuation); *United States v. Beauchamp*, 659 F.3d 560, 574 (6th Cir. 2011) ("[I]f a suspect's response to an illegal stop is a new and distinct crime, such as flight or use of force, any evidence recovered incident to the arrest for the subsequent crime is not tainted by the unlawfulness of the initial detention.").  However, there is no categorical rule that probable cause for a subsequent arrest purges the taint of an unlawful initial arrest.  *See Gross*, 662 F.3d at 404 ("[W]here there is a stop with no legal purpose, the discovery of a warrant during that stop may be a relevant factor in the intervening circumstance analysis, but it is not by itself dispositive."); *Williams*, 615 F.3d at 669–71 (discovery that detainee had an outstanding arrest warrant after an illegal *Terry* stop did not purge the taint); *United States v. Shaw*, 464 F.3d 615, 629 (6th Cir. 2006) ("post-arrest discovery of new evidence" in the form of witness interviews did not "break the causal

connection between the illegal arrest and the subsequent confessions") (distinguishing *Rawlings*).

The government asserts that the drugs found at the Case Avenue house constitute an intervening circumstance that supports attenuation. We agree. Here, the assumed unlawful government behavior was by the officers who performed the traffic stop. But the drugs were found by the detectives who searched the house pursuant to a lawful warrant, who then had clear probable cause to arrest Wells. That distinguishes this case from cases such as *Brown* and *Williams*, where the officers who carried out the unlawful seizures were the same officers who secured the tainted evidence and exploited the unlawful seizure. *See Brown*, 422 U.S. at 593–95; *Williams*, 615 F.3d at 661–62. "The animating purpose underlying the exclusionary rule is the deterrence of unlawful government behavior." *Gross*, 662 F.3d at 401 (citing *Elkins*, 364 U.S. at 217). There would be little deterrent value in saying, and it would make little sense to say, that the discovery of the contraband by detectives uninvolved in any illegality does not constitute intervening circumstances.

Further, while in *Shaw* we found that new evidence in the form of witness statements did not constitute intervening circumstances, 464 F.3d at 629–30, the facts here are distinguishable. In *Shaw*, police were informed of vague allegations that the defendant had sexually assaulted a three-year old. *Id.* at 617–18. The defendant was promptly arrested and held without probable cause for "nearly twenty hours," and "questioned for approximately eleven of those hours" before making incriminating statements. *Id.* at 620. Police used that time to interview potential witnesses, which produced more "equivocal" evidence. *Id.* at 629. Here, by contrast, police did not use the illegal detention to afford themselves more time to investigate—the controlled buys provided more than enough evidence to arrest Wells on drug charges. And the evidence found in

the Case Avenue house, which was found and seized pursuant to a valid search warrant, not an opportunity created by the illegal stop and seizure, was anything but equivocal.

*Purpose and Flagrancy*. Evaluation of the purpose and flagrancy of the police misconduct focuses on whether the stop "was investigatory" (purpose) and whether the manner of the stop was "calculated to cause surprise, fright, and confusion" (flagrancy). *Brown*, 422 U.S. at 605; *Williams*, 615 F.3d at 670. Neither party addresses this factor. However, as noted above, any illegality is attributable solely to the officers who stopped Wells, not to the detectives who searched the house and clearly had probable cause to arrest Wells on drug charges. Thus, that the officers who seized Wells did so without probable cause carries little weight in the attenuation analysis.

*Balancing the Factors*. The admissibility of Wells's statement given at the Case Avenue house is a close call. Voluntariness weighs in the government's favor and temporal proximity weighs in Wells's favor. There are intervening circumstances, but they are not dispositive. The "purpose and flagrancy" factor does not favor either side. The balance tips slightly to the government. But this ruling has little significance because Wells's statement given at the police station is clearly attenuated and even more damaging than the statement given at the house.

The passage of time until the stationhouse statement was longer than for the statements at the house, but the factor still favors Wells. The "purpose and flagrancy" factor of the original arrest remains inconclusive. Most importantly, however, the intervening circumstances between the traffic stop and Wells's statements at the police station weigh heavily in the government's favor. By that point, Wells was in exactly the same position he would have been in had he never been subjected to the illegal traffic stop and had instead been initially arrested on drug charges, which was inevitable. Thus, because "the causal chain" between the traffic stop and Wells's

stationhouse confession was sufficiently attenuated,[3] the latter statement was "'sufficiently an act of free will'" to be admissible against him. *Brown*, 422 U.S. at 602 (quoting *Wong Sun*, 371 U.S. at 486).

## B.

Finally, as noted above, the district court did not rule on the admissibility of the phone. Indeed, after the district court told the parties an evidentiary hearing would be necessary to resolve the issue, Wells's counsel told the court Wells wanted to go ahead and plead guilty because "obviously the confessions were . . . the meat and bones of . . . the motion." (R. 57, PID 374.) Summing up the proceedings, the court could hardly have been clearer: "So we won't have the ruling on the telephone, and we'll defer that . . . ." (*Id.* at 375.) When asked by the court, "Is that satisfactory?," Wells's counsel answered "Yes." (*Id.* at 376.) Then, at Wells's plea hearing, the parties discussed Wells's desire to raise suppression issues on appeal, but Wells's counsel did not even mention the cell phone, much less ask the court to make a ruling or hold the necessary evidentiary hearing. And when appellate rights came up again at sentencing, Wells's counsel spoke only of Wells's desire to appeal "the Court's ruling on his motion to suppress," without mentioning the unresolved issue of the cell phone. (R. 59, PID 447–48.) Wells cannot appeal a ruling the district court did not make.

## III.

For those reasons, we **AFFIRM** the judgment of the district court.

---

[3] There is no claim that Wells's earlier statement was exploited to obtain his stationhouse statement.