NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0506n.06

Case Nos. 20-5819/5820

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Nov 04, 2021
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| JON CHARLES VANCE, | ) | TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| _____/ | ) | |

Before: GUY, COLE, and STRANCH, Circuit Judges.

**RALPH B. GUY, JR., Circuit Judge.** Defendant Jon Vance made a career out of importing methamphetamine from Georgia and selling it in Tennessee for about two years. After he was caught attempting to smuggle drugs into a county jail, Vance was arrested for shoplifting at Walmart and again found in possession of methamphetamine. He was charged and convicted of three drug offenses, including conspiracy. Vance was sentenced to 300 months in prison and ordered to forfeit $114,800 that he reaped from drug sales. Vance appealed, challenging the seizure of evidence from a truck he did not own, the sufficiency of the evidence at trial, a clerical error in the jury instructions, the offense level at sentencing, and the amount of the forfeiture. We AFFIRM.

**I.**

**A.**

*The Initial Drug Enterprise.*  In mid-2016, Jon Vance and Megan Beatty became "50-50" partners in a methamphetamine distribution business.  According to Beatty's testimony, she traveled from Tennessee to Atlanta, Georgia, about once per week to purchase methamphetamine from a supplier.  At first, she was purchasing about "10 ounces," but soon she was purchasing "one to two kilos."  (PageID 2815, 2817-20).  On one occasion, Vance drove with Beatty to Atlanta, but otherwise Beatty made the trip alone and Vance would simply give Beatty money to pay for his half of the drugs.  The cost of a kilogram of the drugs was between $4,000 and $6,000.  After a trip to Atlanta, Vance and Beatty brought the methamphetamine to a storage unit or the house in which they were both living, where they "would stand side by side and weigh it out" into ounce-size bags.  They then sold the drugs to their own customers.  This process was repeated "[t]oo many [times] to count."

In late 2017, Beatty introduced Vance to her then-boyfriend, Derrick Kitchens.  Between October 2017 and January 26, 2018, Kitchens and Beatty made one to two trips per week to Georgia to buy methamphetamine from a supplier, and then Vance and Kitchens would split the drugs at an auto-repair shop owned in part by Vance.  On their first trip they purchased one to two kilograms, but after that they were purchasing, "on average," three to six kilograms each trip. (PageID 2824, 2827).  Although Beatty was no longer selling, Vance and Kitchens would pay Beatty to use her car for the supply trips.  After Kitchens was arrested on January 26, 2018, Vance found a new supplier.

*Smuggling Drugs Into Jail.* Kitchens called from the Hamilton County Jail and spoke to Beatty and Vance on February 13, 2018.[1] Kitchens proposed a scheme to "make a killing." Kitchens's plan was for Beatty and Vance to smuggle methamphetamine and tobacco into the jail, and then he would sell the drugs for $150 to $200 per gram. Kitchens, in turn, would send Vance and Beatty money using an electronic funds card. Vance and Beatty agreed to the plan.

Beatty and Vance immediately went to a store, where they purchased supplies to wrap and package the contraband. Next, they drove to the house of one of Vance's acquaintances, and Vance purchased methamphetamine. While Beatty drove to the jail, Vance and another passenger packaged the methamphetamine and tobacco using two quarter coin rolls, plastic wrap, and double-sided tape around the outside.

Vance and Beatty both walked into the Jail. While Beatty filled out paperwork to pick up Kitchens's property, Vance sat down on a metal bench. As instructed by Kitchens, Vance leaned over and stuck both packages to the underside of the bench. Unbeknownst to Vance, local law enforcement was watching and waiting for him. A detective saw Vance put something under the bench after sitting down. Vance and Beatty were arrested. Under the bench where Vance was sitting, another detective found one tobacco package and one methamphetamine package. A lab test showed that the methamphetamine was 92 percent pure and weighed 13.63 grams (almost half an ounce), for a total of 12.53 grams of pure methamphetamine.

**B.**

*Vehicle Search.* In March 2018, Vance and Connie Beltran were arrested for shoplifting at a Walmart store in Collegedale, Tennessee. The arresting officers searched Vance and seized $1,649 and two knives. Although Vance told the officers that "some guy dropped him off," he had

---

[1] Two of the phone calls were recorded and admitted into evidence at Vance's trial.

in his hand a set of car keys, which included a broken GMC key. Beltran, however, told police "something about a white truck." The officers then viewed the parking lot security video, which showed Vance and Beltran arrived earlier in a white GMC pickup truck. Using the key seized from Vance, Officer Gienapp entered the white GMC truck and started the engine. He immediately stopped and exited the truck when Officer Holloway ordered him to do so and stated that they would get a search warrant. Walmart's management told the officers that the truck should be removed from the premises. As a result, the truck was towed to the police department's impound lot, and the officers obtained a search warrant for the truck.

When officers searched the truck, they found a backpack and in it: a digital scale and 128.67 grams (about 4.5 ounces) of 99 percent pure methamphetamine divided into several bags, which equates to 127.38 grams of pure methamphetamine.

Beatty testified that on the night before Vance was arrested, she saw him put into his backpack a digital scale and "anywhere from 7 to 10 ounces" of methamphetamine, divided between separate bags, and that Vance said he was planning to "drop off around 4 ounces," but "he didn't know if . . . somebody else might want some."[2] (PageID 2853-59). According to Beatty, the price of an ounce of methamphetamine was "[a]bout $400." (PageID 2859). Beatty also stated that she saw Beltran and Vance, with his backpack, leave in a white GMC truck.

Beltran's testimony was consistent. She stated that after Vance talked with Beatty, "he grabbed his backpack and we got in the white truck and we left." They drove to visit Vance's friend, Vance "sold him meth" from his backpack, and then they went to Walmart.

---

[2] When Beatty was asked on cross-examination whether she knew "for certain that [Vance] was going to deliver to a customer that night," Beatty replied: "He told me."

**C.**

Vance and six co-defendants (including Beatty, Beltran, and Kitchens) were charged in a multi-count federal indictment. Vance was charged with three offenses: conspiring to distribute and possess with intent to distribute 50 grams or more of methamphetamine and 500 grams or more of a mixture and substance containing methamphetamine in violation of 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(A) (Count 1); possession with intent to distribute 5 grams or more of methamphetamine or aiding and abetting the same, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B), and 18 U.S.C. § 2, based upon the drug smuggling incident at the jail (Count 19); and possession with intent to distribute at least 50 grams of methamphetamine or aiding and abetting the same, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A), and 18 U.S.C. § 2, based upon the events on the day Vance was arrested at Walmart (Count 20). The indictment also sought a forfeiture order under 21 U.S.C. § 853.

Vance moved to suppress the drugs and scale found in the white pickup truck, arguing that the police "illegally seized Vance's vehicle without a warrant issued on probable cause" and that the subsequent search warrant lacked "the required nexus between the crime charged and the vehicle." After a hearing, the magistrate judge recommended denying Vance's suppression motion. Vance filed his objections, but the district court adopted the magistrate judge's statement of facts and denied Vance's motion.

A two-day jury trial was held. At the close of the government's case-in-chief, Vance moved for a judgment of acquittal on all counts. *See* FED. R. CRIM. P. 29. That motion was denied. Vance presented no evidence. The jury found Vance guilty on all three counts.

Two days later, the government noticed an error in the verdict form and promptly sent the following email to the court and opposing counsel:

> We have noticed an error in the verdict form (on Question 2(a)) that the parties overlooked. It asks: "With respect to Count Nineteen, the amount of methamphetamine (actual) involved ==in the conspiracy as a whole== was (indicate answer by checking one line below) . . . " The highlighted phrase should not have been included in the question regarding the quantity involved in Count Nineteen.

> Because Question 2 itself (without the quantity enhancement of Question 2(a)) was correct, there is no doubt that the jury unanimously found Mr. Vance guilty of possession with intent to distribute methamphetamine on Count Nineteen. So, we think the appropriate remedy is for the conviction on Count Nineteen to be of the lesser-included offense set forth in 21 U.S.C. § 841(b)(1)(C), for possession with intent to distribute any amount of methamphetamine.

(PageID 2491 (highlighting and ellipsis in original)).

Based upon the sufficiency of the evidence and the error in the jury instructions, Vance renewed his Rule 29 motion, arguing that all three counts must be "dismissed with prejudice," or, alternatively, that he is entitled to a new trial. The district court denied that motion, determining that Vance was convicted of the lesser-included offense under 21 U.S.C. § 841(b)(1)(C), for possession with intent to distribute an unspecified amount of methamphetamine.

**D.**

At sentencing, and over Vance's objections, the district court added three separate two-level offense enhancements for: possession of a dangerous weapon, USSG § 2D1.1(b)(1); distribution of a controlled substance in a correctional facility, USSG § 2D1.1(b)(4); and maintaining a premises for manufacturing or distributing a controlled substance, USSG § 2D1.1(b)(12). The court concluded that Vance's criminal history category of V, coupled with his offense level of 40, yielded an advisory Sentencing Guidelines range of 360 months to life in prison. Vance previously moved for a downward variance, and he renewed his request at sentencing.

The district court imposed on Vance a below-guidelines sentence of 300 months of imprisonment. The court also ordered Vance to forfeit $114,800 in drug proceeds that Vance

personally obtained. Vance timely filed separate appeals from the judgment and the forfeiture order, and this court consolidated those appeals.

## II.

Vance assigns error to the district court for denying his motion to suppress the evidence police seized from the white GMC truck. He does not assert that a search occurred when police entered the truck and started the engine in the Walmart parking lot. Rather, he argues the officers lacked probable cause to seize (impound) the truck, and he claims that act somehow "tainted" the subsequent search of the truck conducted with a warrant. These arguments are contrary to the law and the record.[3]

"When a defendant appeals the denial of a motion to suppress evidence, we review the district court's findings of fact under the clear-error standard and we review its conclusions of law de novo." *United States v. Ickes*, 922 F.3d 708, 710 (6th Cir. 2019). The evidence is viewed "in the light most favorable to the government." *Id.*; *accord United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (en banc). We "may affirm on any ground supported by the record and may consider trial evidence in addition to evidence considered at the suppression hearing." *United States v. Binford*, 818 F.3d 261, 267 (6th Cir. 2016).

At the outset, Vance has no right to challenge the seizure and search of the truck. "It has long been the rule that a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that *his* Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Padilla*, 508 U.S. 77, 81 (1993).

---

[3] To the extent Vance's reply brief on appeal can be construed to raise an argument challenging the fact that Officer Gienapp entered the truck and started the engine, Vance has abandoned that argument. *United States v. Johnson*, 440 F.3d 832, 845-46 (6th Cir. 2006) ("An appellant abandons all issues not raised and argued in its initial brief on appeal." (citation omitted)); FED. R. APP. P. 28(a)(8)(A).

This concept of so-called "standing" is "subsumed under substantive Fourth Amendment doctrine." *Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018) (quoting *Rakas v. Illinois*, 439 U.S. 128, 139 (1978)). The controlling question is "whether the person claiming the constitutional violation had a 'legitimate expectation of privacy in the premises' searched." *Id.* at 1526 (quoting *Rakas*, 439 U.S. at 143). For instance, a defendant does not have an expectation of privacy in another person's purse, even when it contains the defendant's illegal drugs. *Rawlings v. Kentucky*, 448 U.S. 98, 104-05 (1980). And as pertinent here, "a person present in a stolen automobile at the time of the search may [not] object to the lawfulness of the search of the automobile." *Rakas*, 439U.S. at 141 n.9. "No matter the degree of possession and control, the car thief would not have a reasonable expectation of privacy in a stolen car." *Byrd*, 138 S. Ct. at 1529.

Vance fits that bill because there is no evidence he was lawfully in possession of the truck. While in the Walmart parking lot, Officer Holloway discovered that Vance and Beltran both had outstanding warrants, the license plate on the truck was not registered to it, and neither the license plate nor the VIN were registered to Vance or his accomplice—leading Holloway to suspect the truck might be "stolen." Vance also denied having a vehicle in the parking lot when asked "directly." After the incident, police eventually found that the truck belonged to a woman with mental illness. She did not wish to report the truck as stolen and explained that she had let someone borrow it and could not remember the last time she had seen the truck. But when questioned further, the woman stated that she "didn't know who [Vance] was." Vance has failed to show that the registered owner, or any other person with the authority, gave him permission to use the truck. *See, e.g.*, *Byrd*, 138 S. Ct. at 1529; *United States v. Eckhart*, 569 F.3d 1263, 1275 (10th Cir. 2009). In these circumstances, as the government asserted at the suppression hearing, "Vance has no standing to argue whether the search was valid or invalid."

Even so, Vance's suppression challenge fails on the merits because the officers had probable cause to seize (impound) and then search the truck without a warrant.

Under the so-called automobile exception to the Fourth Amendment's warrant requirement, police may search a vehicle "without a warrant if their search is supported by probable cause" to believe that it contains contraband or evidence of a crime. *California v. Acevedo*, 500 U.S. 565, 579-80 (1991); *see Carroll v. United States*, 267 U.S. 132, 153 (1925). Where probable cause exists, "officers may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody." *Michigan v. Thomas*, 458 U.S. 259, 261 (1982) (per curiam). "There is no requirement that the warrantless search of a vehicle occur contemporaneously with its lawful seizure." *United States v. Johns*, 469 U.S. 478, 484 (1985). "[N]or does it depend upon a reviewing court's assessment of the likelihood . . . that the car would have been driven away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant." *Thomas*, 458 U.S. at 261. Only probable cause is required because "the 'automobile exception' has no separate exigency requirement." *Maryland v. Dyson*, 527 U.S. 465, 466-67 (1999).

"Probable cause . . . is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014). Looking to "the totality of the circumstances" and the "facts available" to the officer, probable cause exists if a "reasonable" person would believe there is a "fair probability" that "contraband or evidence of a crime" will be found in a particular place. *Florida v. Harris*, 568 U.S. 237, 243-44 (2013) (citations omitted); *see Illinois v. Gates*, 462 U.S. 213, 238 (1983).

Probable cause existed here—before the truck was towed—because there was a "fair probability" that the truck itself was stolen, and that the officers would find stolen merchandise and narcotics in the truck. Based upon what the officers knew about the license plate and VIN

alone, the officers could seize the vehicle without a warrant because they "certainly had probable cause to believe that the vehicle *itself* was contraband." *Florida v. White*, 526 U.S. 559, 565 (1999). Moreover, when the officers spoke with Walmart's loss prevention agent, they saw security video of Vance and Beltran "skip scanning," i.e., merely pretending to ring up merchandise. The officers saw that Vance and Beltran "had gone into the store and came back out and then Ms. Beltran went in . . . and came back out." In Officer Holloway's experience, "shoplifters go back and forth a few times. If they don't get caught, they'll go back and get some more."[4] It was certainly reasonable for the officers to believe that Vance had stashed stolen merchandise in the truck. Add in the fact that Holloway noticed Vance's speech was slurred and "smelled marijuana" on Vance. Vance indeed admitted that he had smoked marijuana and that the night before he had used methamphetamine. According to Holloway, Beltran also admitted that she and Vance had used methamphetamine earlier that morning. And Holloway believed Beltran may have ingested the drugs more recently.

All of these facts together led Officer Holloway to suspect that he "may run across . . . paraphernalia or actually illegal narcotics" or "more stolen property" in the truck. That conclusion was reasonable. Thus, probable cause existed to search the truck on the spot or tow it to the impound lot to conduct the search. *Johns*, 469 U.S. at 481, 484. The officers chose the latter. "[T]he justification to conduct such a warrantless search does not vanish once the car has been immobilized." *Thomas*, 458 U.S. at 261.[5] Because the officers did not need the warrant to

---

[4] After watching the security video, Officer Gienapp found the truck and started the engine. (PageID 1022-26).

[5] Walmart's agent told Officer Holloway that the truck should be removed from the premises, and Holloway also explained that he would not execute a warrant in the middle of the Walmart parking lot. He obtained and executed a search warrant that afternoon.

conduct the search, we need not consider the sufficiency of the warrant or whether the officers acted in good-faith reliance on the warrant.

**III.**

Vance next challenges the jury's verdict on two grounds. First, he contends there was insufficient evidence to support his conviction on any of the three offenses. Second, Vance claims he is entitled to a judgment of acquittal or a new trial because there was an error in the verdict form, which precluded the jury from finding the elements of the charged offenses beyond a reasonable doubt. Neither argument is well-founded.

**A.**

There was more than enough evidence to support all three of Vance's convictions. The government's case-in-chief consisted of twenty-four exhibits (which included recorded phone conversations) and nine witnesses, including two of Vance's co-conspirators (Beatty and Beltran).

In challenging the sufficiency of the evidence, Vance "bears a very heavy burden." *United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010) (quoting *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006)). "The evidence is sufficient to support a conviction whenever, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Our role is limited in that "we do not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

*Conspiracy (Count 1).* A conviction for conspiracy under 21 U.S.C. § 846, requires the government to prove: "(1) an agreement to violate drug laws, in this case 21 U.S.C. § 841(a)(1); (2) knowledge and intent to join the conspiracy; and (3) participation in the conspiracy." *United*

*States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005) (quoting *United States v. Welch*, 97 F.3d 142, 148-49 (6th Cir. 1996)). Ample evidence supports each element.

An agreement existed. "[T]he government need not prove the existence of a formal or express agreement among the conspirators. Even a tacit or mutual understanding among the conspirators is sufficient." *United States v. Gardner*, 488 F.3d 700, 710 (6th Cir. 2007). Here, Vance pooled thousands of dollars with Beatty and Kitchens to maximize the quantity of methamphetamine they could purchase. There was a clear plan to make regular trips to Georgia to purchase multiple kilograms of the drug, and then meet to repackage it into smaller quantities. Thus, "a conspiracy can be inferred from [the] repeated purchases of large quantities of drugs," and "it can be assumed that participants understand that they are participating in a joint enterprise because their success is dependent on the success of" the other co-conspirators. *United States v. Sills*, 662 F.3d 415, 417 (6th Cir. 2011). And Vance expressly agreed over the phone to smuggle drugs to Kitchens for him to sell in the county jail.

Vance also knowingly joined and participated in the conspiracy. Why else would Vance give Beatty thousands of dollars to purchase a supply of methamphetamine in another State, pay Beatty to use her car for the trips, provide his auto-repair shop as a place where they could divide the drugs, and personally stick the drugs under the bench in the jail? This is more than sufficient given that "once the existence [of] a conspiracy is shown, the evidence linking an individual defendant to that conspiracy need only be slight." *United States v. Smith-Kilpatrick*, 942 F.3d 734, 745 (6th Cir. 2019) (quoting *United States v. Caver*, 470 F.3d 220, 233 (6th Cir. 2006)). And yet, despite his tremendous participation in the joint venture, Vance insists he was "merely associated with Beatty and Kitchens." That is one way to see it, albeit doubtful. But "it is the responsibility

of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam).

Vance also contends that there was not a conspiracy because each person was selling the drugs to their own customers. But that does not matter. "A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Salinas v. United States*, 522 U.S. 52, 63 (1997); *accord Ocasio v. United States*, 136 S. Ct. 1423, 1429-30 (2016). Nor is it relevant, as Vance asserts, that the "drugs never made it inside the jail." (Reply Br. 7). That is not an element of the underlying offense, and even if it was, "[i]t is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues." *Salinas*, 522 U.S. at 65. In fact, the government "need not prove the commission of any overt acts in furtherance of the conspiracy." *United States v. Shabani*, 513 U.S. 10, 15 (1994).

*Possession With Intent to Distribute or Aiding and Abetting the Same (Counts 19 and 20).* "To sustain a conviction for possession with intent to distribute a controlled substance, the government must show beyond a reasonable doubt that the defendant: (1) knowingly (2) possessed a controlled substance (3) with intent to distribute." *United States v. Calvetti*, 836 F.3d 654, 668 (6th Cir. 2016). "[A] person is liable under [18 U.S.C.] § 2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." *Rosemond v. United States*, 572 U.S. 65, 71 (2014). Vance only contests the intent element. Vance overlooks that eyewitnesses testified to his role in the crimes and circumstantial evidence corroborated their stories.

On Count 19, it borders on frivolous for Vance to argue that "[t]here is no proof [he] intended the drugs smuggled into the [jail] be distributed inside the jail." (Appellant Br. 39).

Distribution to inmates was the plan Kitchens expressly conveyed to Vance. Beatty testified Vance purchased the drugs and packaged the drugs. A detective testified that he saw Vance put something under the bench in the jail's lobby, and the drugs were found in that same place under the bench. Vance's conduct evidenced his intent to facilitate the distribution of drugs in the jail.

As for Count 20, there is likewise extensive evidence to show Vance intended to distribute methamphetamine. Indeed, "[t]he government may meet its burden through circumstantial evidence alone, and such evidence need not exclude every possible hypothesis except that of guilt." *Smith-Kilpatrick*, 942 F.3d at 745 (quoting *United States v. Jackson*, 55 F.3d 1219, 1225 (6th Cir. 1995)). "Intent to distribute can be inferred from," *inter alia*, the possession of a quantity of drugs "too large for personal use alone," *Jackson*, 55 F.3d at 1226; "the presence of such items as a scale . . . and packaging materials," *United States v. Hill*, 142 F.3d 305, 312 (6th Cir. 1998); the concurrent seizure of large amounts of currency, *id.*; and the "purity" of the drugs, *United States v. Vincent*, 20 F.3d 229, 233 (6th Cir. 1994); *see also United States v. Montgomery*, 491 F. App'x 683, 689 (6th Cir. 2012).

Here, the uncontroverted evidence at trial showed that Vance left his house with Beltran and his backpack, which contained "anywhere from 7 to 10 ounces" of methamphetamine in separate bags. Vance told Beatty that he was going to "drop off around 4 ounces," but "he didn't know if . . . somebody else might want some." Beltran stated that she was with Vance when they visited a friend and saw that Vance "sold him meth" from his backpack. When Vance was arrested shortly thereafter, Vance also had $1,649 in his pocket. In the truck Vance brought to Walmart, police found a backpack containing a digital scale (suggesting distribution) and 128.67 grams of 99 percent pure methamphetamine divided into several bags. That amount is too large for personal use. As a federal agent testified, a "typical meth user" will "maybe" use "a couple grams" per day.

Beltran, an admitted methamphetamine "addict," testified that her *maximum* daily usage was about 3.5 grams, which she agreed was "a lot." At that rate, Vance had enough methamphetamine in his backpack to supply a heavy user for thirty-six days. The jury reasonably inferred that Vance intended to resell the other four ounces he still possessed.

**B.**

The error in the verdict form does not entitle Vance to any relief. The error only affected the drug quantity for Count 19, and Vance received a windfall because the district court reduced Vance's conviction on that count to the lesser-included offense under 21 U.S.C. § 841(b)(1)(C).

Vance did not object to the verdict form when given the opportunity to do so before the jury retired to deliberate. As a result, we can only review Vance's challenge for plain error. FED. R. CRIM. P. 30(d). "[T]he burden of establishing entitlement to relief for plain error is on [Vance]." *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004). Under plain-error review, there must be a "clear" "error or defect" that "affected the outcome," i.e., "prejudice" to the defendant, and then this court "has the discretion to remedy the error . . . only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Puckett v. United States*, 556 U.S. 129, 135 (2009). "Meeting all four prongs is difficult, as it should be." *Id.* "In the context of challenges to jury instructions, plain error requires a finding that, taken as a whole, the jury instructions were so clearly erroneous as to likely produce a grave miscarriage of justice." *United States v. Semrau*, 693 F.3d 510, 528 (6th Cir. 2012) (citation omitted).

The error here stems from Questions 1(a) and 2(a) on the verdict form. In Question 1, the jury found Vance guilty on Count 1 (conspiracy to distribute methamphetamine), and then in Question 1(a), the jury was given three options to determine the amount of drugs "involved *in the conspiracy as a whole*": (1) at least 50 grams of methamphetamine or 500 grams of a mixture

containing methamphetamine; (2) between 5 grams and 50 grams of methamphetamine, or between 50 grams and 500 grams of a mixture containing methamphetamine; or (3) "less than" 5 grams of methamphetamine or 500 grams of a mixture containing methamphetamine. (Emphasis added). The jury selected the first option. In Question 2, the jury found Vance guilty on Count 19, and then in Question 2(a) the jury was given two options to determine the amount of drugs "involved *in the conspiracy as a whole*": (1) at least 5 grams of methamphetamine; or (2) "less than" 5 grams of methamphetamine. (Emphasis added). The jury selected the first option.

Question 2(a) should not have inquired about the drug quantity "involved in the conspiracy as a whole." Instead, consistent with the indictment, the question should have only asked the jury to find the amount of methamphetamine involved in the drug smuggling attempt at the jail on February 13, 2018.

But that does not mean there was a miscarriage of justice. The jury's response to Question 1(a) regarding Count 1—that "the conspiracy as a whole" involved "fifty grams *or more* of methamphetamine (actual) or five hundred grams or more of a mixture or substance containing a detectable amount of methamphetamine"—is logically consistent with the jury's response to Question 2(a) regarding Count 19—that "the conspiracy as a whole" involved "five grams *or more* of methamphetamine (actual)." (Emphasis added).

Yet Vance makes a leap in logic and concludes that the jury's drug quantity findings constitute "inconsistent verdicts." "[I]nconsistent verdicts are generally held not to be reviewable." *United States v. Lawrence*, 555 F.3d 254, 262 (6th Cir. 2009); *see United States v. Powell*, 469 U.S. 57, 64-69 & n.8 (1984). This court, however, has recognized two (ostensibly similar) exceptions: (1) the verdict is "marked by such inconsistency as to indicate arbitrariness or irrationality," *Lawrence*, 555 F.3d at 263; or (2) "a defendant receives *two guilty verdicts* that

- 16 -

are logically inconsistent," *United States v. Smith*, 749 F.3d 465, 498 (6th Cir. 2014) (emphasis added) (quoting *United States v. Ruiz*, 386 F. App'x 530, 533 (6th Cir. 2010); *United States v. Ashraf*, 628 F.3d 813, 824 (6th Cir. 2011). Neither exception has any application here.

The death knell for Vance's challenge is that the district court treated "Question 2(a) as unanswered," meaning that on Count 19 Vance was convicted for the lesser-included offense under 21 U.S.C. § 841(b)(1)(C)—possession of methamphetamine with intent to distribute an unspecified amount of methamphetamine. Conspicuously missing from Vance's briefs is any argument that this result was impermissible or caused him prejudice. The truth is Vance was not prejudiced by the clerical error—he benefited. He was "merely convicted of a lesser-included offense and all the elements of the former necessarily include those of the latter." *See Martinez*, 430 F.3d at 340.

## IV.

Vance also challenges his sentence. He assigns error to the district court in calculating his base offense level and for imposing three sentencing enhancements.

In reviewing a district court's application of the Sentencing Guidelines, we review "factual findings for clear error and legal conclusions de novo." *United States v. Abdalla*, 972 F.3d 838, 850 (6th Cir. 2020). Questions "involving mixed questions of law and fact receive 'deferential review' and not de novo review." *Id.* (quoting *Buford v. United States*, 532 U.S. 59, 64 (2001)); 18 U.S.C. § 3742(e). "The prosecution has the burden to prove by a preponderance of the evidence that [an] enhancement applies." *United States v. Washington*, 715 F.3d 975, 984 (6th Cir. 2013).

## A.

There is no error as to Vance's base offense level of 34. In this case, the base offense level was governed by the quantity of drugs for which Vance was responsible. USSG §§ 2D1.1(a)(5),

(c)(3) & comment., n.8(D).  "The district court can make a reasonable estimate based on physical evidence or testimony."  *United States v. Tisdale*, 980 F.3d 1089, 1096 (6th Cir. 2020).  And "testimonial evidence from a coconspirator may be sufficient to determine the amount of drugs for which another coconspirator should be held accountable."  *United States v. Swanberg*, 370 F.3d 622, 625 (6th Cir. 2004).

The PSR attributed to Vance eight kilograms of methamphetamine mixture and 139.91 grams of methamphetamine.  Over Vance's objection, the district court adopted the drug quantity finding.

The district court did not commit clear error.  Vance brought 12.53 grams into the jail and he had 127.38 grams in his backpack when he was arrested outside Walmart—a total of 139.91 grams.  Beltran told federal agents that she witnessed four or five occasions when Vance received about two kilograms of methamphetamine, for a total of at least eight kilograms.  Beatty also testified at trial that between October 2017 and January 26, 2018, Vance and Kitchens split, "on average," three to six kilograms "[o]ne to two times [each] week."  She said Vance received no less than one kilogram on each occasion.  (PageID 2829).  Moreover, about a year earlier in 2016, Vance and Beatty were "50-50" partners splitting about "one to two kilos" of methamphetamine once per week.  The district court's estimate of a little more than eight kilograms was quite conservative.

**B.**

The district court also did not err in imposing the two-level enhancement under USSG § 2D1.1(b)(1), because "a dangerous weapon (including a firearm) was possessed."

"The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense."  USSG § 2D1.1(b)(1), comment.,

n.11(A). The government is not required to prove that the weapon was "possessed *during the commission of the crime.*" *United States v. Greeno*, 679 F.3d 510, 514 (6th Cir. 2012); *see, e.g.*, *United States v. Faison*, 339 F.3d 518, 520 (6th Cir. 2003) (noting that the during-the-offense requirement was removed in 1991). "[A]ll that the government need show"—by a preponderance of the evidence—"is that the dangerous weapon [was] possessed during 'relevant conduct.'" *Greeno*, 679 F.3d at 514 (quoting *Faison*, 339 F.3d at 520); *accord United States v. Ward*, 506 F.3d 468, 475 (6th Cir. 2007).

The government satisfied its initial burden. Relevant conduct is defined broadly under the guidelines as that which "occurred during the commission of the offense of conviction," including "all acts . . . caused by the defendant" and, "*in the case of a jointly undertaken criminal activity* . . ., "all acts and omissions of others that were . . . within the scope of," "in furtherance of," and "reasonably foreseeable in connection with that criminal activity." USSG § 1B1.3(a)(1) (emphasis added). Here, Beatty testified that during the time when she was "in the meth business" with Vance and traveling to Georgia to "pick up meth," Vance gave her a firearm. It was a "throw-away," a gun without a serial number, allowing Beatty to "use [it] and then toss [it] away." Based upon Beatty's testimony, the district court concluded that § 2D1.1(b)(1) applied. That was not error. First, Vance possessed a gun during the methamphetamine conspiracy. Second, Vance gave the gun to his co-conspirator to use while she was traveling across state lines with thousands of dollars to purchase multiple kilograms of methamphetamine from drug suppliers. In applying the firearm enhancement under § 2D1.1(b)(1), we have held that "possession of a gun by one coconspirator is attributable to another coconspirator if such possession constitutes reasonably foreseeable conduct." *United States v. Catalan*, 499 F.3d 604, 607 (6th Cir. 2007) (quoting *United*

*States v. Cochran*, 14 F.3d 1128, 1132 (6th Cir. 1994)). The evidence checks all the boxes for relevant conduct under § 1B1.3(a)(1).[6]

Because the government met its burden, "a presumption arises that 'the weapon was connected to the offense.'" *United States v. Wheaton*, 517 F.3d 350, 367 (6th Cir. 2008) (quoting *United States v. Hough*, 276 F.3d 884, 894 (6th Cir. 2002)). To rebut that presumption, Vance was required to "present evidence, not mere argument," establishing "that it was 'clearly improbable' that the weapon was connected to the offense." *Greeno*, 679 F.3d at 514 (citation omitted); *see* § 2D1.1(b)(1), comment., n.11(A). Vance presented no evidence. Accordingly, the enhancement applies. *United States v. Johnson*, 344 F.3d 562, 567 (6th Cir. 2003).

## C.

Vance's next challenge is wholly frivolous. The district court imposed the two-level enhancement under USSG § 2D1.1(b)(4), which applies "[i]f the object of the offense was the distribution of a controlled substance in a prison, correctional facility, or detention facility." USSG § 2D1.1(b)(4). That was precisely the sole object of the offense in Count 19, i.e., smuggling drugs to Kitchens for distribution within the Hamilton County Jail. We tend to agree with the district court that "there's just no good faith basis to argue otherwise."

## D.

Vance does not fare any better with respect to the two-level enhancement under USSG § 2D1.1(b)(12), for "maintain[ing] a premises for the purpose of manufacturing or distributing a

---

[6] To the extent Vance argues that he "did not know" the enhancement could be applied due to the firearm he gave Beatty, rather than the two knives he possessed when arrested, the record contradicts his claim. (Appellant Br. 46). In rejecting Vance's objection to the recommendation in the PSR that the knives served as a basis to apply § 2D1.1(b)(1), the probation officer explained that the enhancement would also apply solely based upon the fact that "Vance provided [Beatty] with a 'throw away' firearm."

controlled substance." This drug-premises enhancement "applies to anyone who (1) knowingly (2) opens or maintains any place (3) for the purpose of manufacturing or distributing a controlled substance." *United States v. Johnson*, 737 F.3d 444, 447 (6th Cir. 2013).

Vance only contests the third element. Drug enterprise activities "need not be the sole purpose for which the premises was maintained," so long as that is "one of the defendant's primary or principal uses for the premises." USSG § 2D1.1(b)(12), comment., n.17. The salient question is "whether [the defendant's premises] 'played a significant part' in distributing drugs." *United States v. Bell*, 766 F.3d 634, 637 (6th Cir. 2014) (quoting *Johnson*, 737 F.3d at 449).

Vance's auto-repair shop played a significant part in the conspiracy. Once or twice per week between October 2017 and January 26, 2018, Kitchens and Beatty purchased three to six kilograms of methamphetamine, and they "would always bring it back" to Vance's auto-repair shop in Flintstone, Georgia, where Vance and Kitchens "would divvy it up." Vance admits "[t]here's no denying" that was Beatty's testimony. Yet he points to the fact that Beltran testified she only saw Kitchens and Beatty "working on cars" and "doing drugs" at Vance's shop and argues that the government did not meet its burden because there was "conflicting testimony." But the district court evidently found Beatty's testimony more credible. That decision is no basis for resentencing. "[D]istrict courts receive 'even greater deference' when their 'findings are based on determinations regarding the credibility of witnesses.'" *Abdalla*, 972 F.3d at 851 (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 575 (1985)). The enhancement under § 2D1.1(b)(12) stands.

**V.**

That leaves Vance's appeal of the forfeiture order. The district court ordered Vance to forfeit $114,800 under 21 U.S.C. § 853, finding that Vance reaped that amount from "at least" 287 ounces of methamphetamine at a price of $400 per ounce. We find no reversible error.

In reviewing a forfeiture order, "the district court's interpretation of the forfeiture laws is . . . reviewed *de novo*," its "findings of fact are reviewed under a clearly erroneous standard," and "the question of whether those facts are sufficient to constitute a proper criminal forfeiture is reviewed *de novo*." *United States v. Warshak*, 631 F.3d 266, 331 (6th Cir. 2010) (citation omitted).

Congress declared that "[a]ny person convicted of" certain serious drug crimes "shall forfeit . . . any property constituting, or derived from, *any proceeds the person obtained*, directly or indirectly," from the underlying drug crimes. 21 U.S.C. § 853(a)(1) (emphasis added). "Section 853(a)'s limitation of forfeiture to tainted property acquired or used by the defendant . . . foreclose[s] joint and several liability for co-conspirators." *Honeycutt v. United States*, 137 S. Ct. 1626, 1633 (2017). "[T]he court must determine what property is subject to forfeiture." FED. R. CRIM. P. 32.2(b)(1)(A). "If the government seeks a personal money judgment," as in this case, "the court must determine the amount of money that the defendant will be ordered to pay." *Id.* "The court's determination may be based on evidence already in the record, . . . and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." FED. R. CRIM. P. 32.2(b)(1)(B). The government need only prove the forfeiture amount "by a preponderance of the evidence." *United States v. Droganes*, 728 F.3d 580, 587 (6th Cir. 2013).

The district court did not clearly error in ordering Vance to forfeit $114,800. The court determined the price at which Vance sold methamphetamine based upon Beatty's uncontroverted

testimony that one ounce of methamphetamine costs "[a]bout $400." Vance has no quarrel with the price. Instead, he takes issue with the fact that the district court used 287 ounces as the multiplier. That drug quantity was based upon the PSR's account of Beltran's statement to federal agents that Vance personally received at least eight kilograms (about 282.19 ounces) of methamphetamine, plus 139.91 grams (about 4.94 ounces) of methamphetamine (i.e., the 12.53 grams Vance brought into the jail and the 127.38 grams found in his backpack when he was arrested at Walmart). Although Vance and the government point out that the 139.91 grams were seized from Vance and thus he clearly did not obtain any proceeds from those drugs, that does not provide a basis for reversal in this case.

The district court went on to explain that Vance "could be held accountable for much more" than the proceeds from 287 ounces. As the court noted, Beatty testified at trial that between October 2017 and January 26, 2018, Vance and Kitchens were splitting, "on average," three to six kilograms "[o]ne to two times [each] week," and that the least amount Beatty ever saw Vance receive from Kitchens on these resupply trips was one kilogram. (PageID 2824-27, 2829). Erring on the conservative side by assuming the trips "occurred only once a week for only three months" (i.e., twelve trips) and that each trip involved "only three kilograms," the court calculated a total of thirty-six kilograms. Then the court "assum[ed] that proceeds were shared equally"—even though Beatty was no longer selling and only Kitchens and Vance were splitting the drugs. Thus, the court concluded that Vance obtained the "*proceeds* from *more than* eight kilograms"—twelve kilograms (or 423.29 ounces) to be precise. (Emphasis added). But the court also noted that between the end of 2016 and about October 2017, Beatty and Vance were "50-50" partners, and each week they were selling between "10 ounces" (in the beginning) and "one to two kilos."

The court did not, however, include any of these other amounts because the government only sought the proceeds from 287 ounces of methamphetamine.[7]

Multiplying 287 ounces by the estimated street value of $400 per ounce, the court concluded that Vance "obtained *at least* $114,800 from the sale of methamphetamine." (Emphasis added). The evidence supports the district court's conservative finding. And "the law does not demand mathematical exactitude in calculating the proceeds subject to forfeiture. . . . Rather, district courts may 'use general points of reference as a starting point' for a forfeiture calculation and 'make reasonable extrapolations' supported by a preponderance of the evidence." *United States v. Roberts*, 660 F.3d 149, 166 (2d Cir. 2011) (citation omitted). The court did just that.

\* \* \*

The judgment is AFFIRMED.

---

[7] When Vance spoke to Kitchens over the phone on February 13, 2018, Vance claimed to have $200,000 in the bank—despite his admission in the PSR that "he has not held lawful, gainful employment since" mid-2016, about the same time he and Beatty began trafficking methamphetamine as "50-50" partners. Vance's $200,000 equates to 500 ounces (or 14.17 kilograms) of methamphetamine at a price of $400 per ounce.